Entered on Docket April 20, 2018

**Below is a Memorandum Decision of the Court.**

_____
**Christopher M. Alston
U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

---

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| In re | Chapter 13 |
|---|---|
| CALEB JOE JONES, | Case No. 17-12813-CMA |
| Debtor. | MEMORANDUM DECISION AND ORDER ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION |

THIS MATTER came before the Court on the Debtor's Objection to Claim No. 1 of Kitsap Credit Union (the "Objection"). The Court considered the Objection, the Response of Kitsap Credit Union ("Kitsap"), and the Debtor's Reply, and has taken judicial notice of all relevant entries on the docket in this case to ascertain facts not reasonably in dispute.[1] The Court conducted a hearing on the Objection on February 21, 2018. The Court heard the arguments of counsel and took the matter under advisement.

This claim objection appears to present an issue of first impression to the Court: whether optional contracts for gap insurance and vehicle maintenance should be treated as secured under

---

[1] Fed. R. Evid. 201; *In re Butts*, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006).

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 1

the "hanging paragraph" of 11 U.S.C. § 1325(a).[2] If not, the Court must then determine if and how to apportion prepetition payments on the loan between the secured and unsecured amounts of the debt. For the reasons below, the Court concludes that Kitsap's claim is subject to bifurcation under Bankruptcy Code § 506(a)(1), Kitsap's collateral does not secure the amounts financed to pay for the optional contacts, and the prepetition payments shall be apportioned pro rata between the secured and unsecured portions of the claim in accordance with the "dual status rule." Following are the Court's findings of fact and conclusions of law under Civil Rule 52(a), applicable with respect to this contested matter under Rules 3007, 7052, and 9014.

## I.    FACTUAL BACKGROUND

The relevant facts are not in dispute. On September 17, 2016, the Debtor entered into a Retail Installment Sale Contract ("Sale Contract") with West Hills Ford Mazda for the purchase of a used 2015 Dodge Ram 2500 (the "Vehicle"). The Sale Contract states the "Total Cash Sale Price" of the Vehicle is $56,589.12.[3] The Sale Contract includes additional charges for an "Optional Gap Contract" in the amount of $795.00, a "National Premium Maintenance" contract in the amount of $2,653.00, and a "VIP Maintenance" contract in the amount of $498.00 (collectively, the "Option Contracts"). These items total $3,946.00.[4] After taxes, license, and fees, the amount financed totals $61,061.76. The Sale Contract provides the Debtor is conveying a purchase money security interest in the Vehicle. The dealer assigned its interest in the Sale Contract to Kitsap.[5]

On June 22, 2017, which was less than 910 days after the Debtor incurred the debt secured by the Vehicle, the Debtor filed for Chapter 13 bankruptcy relief. Prior to filing his petition, the Debtor paid a total of $2,831.57 on the financed obligation. Kitsap timely filed a

---

[2] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101–1532; all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."
[3] This figure includes the "Vehicle Cash Price" in the amount of $51,779.00, sales tax in the amount of $4,660.12, and a "Documentary Service Fee" in the amount of $150.00.
[4] While the Sale Contract includes a charge for sales tax on the Vehicle Cash Price, it does not indicate any charge for tax on the pertinent Option Contracts. Accordingly, the Court will assume $3,946.00 is the total debt incurred for the Option Contracts.
[5] The Sale Contract states the dealer "assigns its interest . . . to Kitsap Credit Union," but the record is unclear as to the date of the assignment.

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 2

proof of claim in which it asserted a secured claim in the amount of $58,230.19. The Debtor scheduled the Vehicle with a value of $40,000, and Kitsap does not challenge this valuation.

The Debtor timely objected to Kitsap's claim, arguing the claim is not secured to the extent it seeks repayment of money advanced for the purchase of the Option Contracts. Relying on *In re Penrod*, 611 F.3d 1158 (9th Cir. 2010) ("*Penrod II*"), the Debtor argues the claim should be bifurcated and allowed as a secured claim only as to the amounts required to purchase the Vehicle. As a consequence, the amounts financed attributable to the Option Contracts can be allowed only as an unsecured claim. Kitsap responds that *Penrod* does not apply, as the financed debt at issue in *Penrod* included "negative equity" from a trade-in rather than option contracts that add value to the collateral. Kitsap contends that the Vehicle secures the entire amount financed by the Debtor. Kitsap further argues that if the Court determines the entire claim is not secured, then any prepetition payments would have been allocated only to the unsecured portion of the debt. The Debtor replies that *Penrod* should be interpreted broadly to include option contracts, and that the prepetition payments should be applied proportionately between the secured and unsecured portions of the debt, resulting in a smaller secured claim.

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (K).

## III. ANALYSIS

**A. Kitsap Has Standing.**

Initially, the Debtor suggests Kitsap lacks standing to assert its claim because Kitsap was not a party to the Sale Contract. The Court rejects this contention. As the assignee of the Sale Contract, Kitsap has standing to enforce the agreement pursuant to Bankruptcy Code § 502 and the Revised Code of Washington (RCW) § 62A.3–301.[6] An assignee typically "steps into the

---

[6] Property interests referred to in the Bankruptcy Code are generally defined by state law. *Butner v. United States*, 440 U.S. 48, 54 (1979). The Sale Contract does not contain a choice of law provision. Absent a choice of law provision, a contract is generally governed by the law of the state in which the contract was negotiated and performed. Restatement (Second) of Conflict of Laws § 188 (1971) ("If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied . . . ."); *Rano v. Sipa*

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 3

shoes" of an assignor. *In re Boyajian*, 367 B.R. 138, 144–45 (B.A.P. 9th Cir. 2007). "Where a secured claim is assigned, the collateral is ordinarily assigned as well." Restatement (Second) of Contracts § 340 cmt. b. The assignment of a security interest does not destroy its purchase money status. *In re Trejos*, 374 B.R. 210, 215–16 (B.A.P. 9th Cir. 2007).

### B. The Court May Bifurcate Kitsap's Claim Because the Debtor Was Not Required to Purchase the Option Contracts to Obtain the Vehicle.

The Bankruptcy Code provides that a secured claim may be bifurcated to the extent that the amount exceeding the value of the collateral is treated as unsecured. 11 U.S.C. § 506(a)(1). In other words, when a secured claim exceeds the value of the collateral, the debtor may "cram down" the secured claim to collateral's value, and any shortfall is treated as an unsecured claim.

Under the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act amendments, Congress added language to section 1325(a) to protect claims of secured creditors who hold a purchase money security interest ("PMSI") in cars. As the provision is not enumerated as a subsection, this text is commonly referred to as the "hanging paragraph" and provides that, for purposes of paragraph 1325(a)(5), under certain conditions section 506 shall not apply to a claim if the creditor has a PMSI in a vehicle that secures the debt. 11 U.S.C. § 1325(a).[7] The hanging paragraph "was designed to combat a particular perceived abuse by debtors in chapter 13: purchasing a car shortly before a chapter 13 bankruptcy filing and then taking advantage of the substantial depreciation that occurs immediately after a new car is driven off the lot." *In re Penrod*, 392 B.R. 835, 856 (B.A.P. 9th Cir. 2008) ("*Penrod I*"). This provision thus prevents a debtor from employing section 506 to cram down a secured claim to the value of a recently-financed vehicle.

Under the hanging paragraph, certain conditions must exist before the full amount of the

---

*Press*, 987 F.2d 580, 585 fn.2 (9th Cir. 1993). Because the Sale Contract was negotiated and performed in Washington, and the security interest was therefore created in Washington, the Court applies Washington law.

[7] The Bankruptcy Code does not define the term "purchase money security interest." Property interests are determined by state law. *See supra* note 6. For the definition of PMSI, courts have uniformly looked to the law of the state in which the security interest was created. *Billings v. AVCO Colo. Indus. Bank* (*In re Billings*), 838 F.2d 405, 406 (10th Cir. 1988). Under Washington law, a security interest in goods is a PMSI to the extent that the goods are purchase-money collateral with respect to the security interest. RCW § 62A.9A–103(b). Simply stated, it is a security interest in the collateral that was purchased with the value extended by the creditor.

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 4

claim will be treated as secured: (1) the creditor must have a PMSI, (2) the PMSI must secure the debt that is the subject of the claim, (3) that debt must be incurred no more than 910 days before the petition date, (4) the collateral for the debt must be a motor vehicle, and (5) that motor vehicle must have been acquired for the personal use of the debtor.

In this case, the collateral at issue is a motor vehicle acquired for the personal use of the debtor, the Vehicle was acquired within 910 days of the petition date, and Kitsap has a PMSI in the total cash price of the Vehicle. The only open issue is whether Kitsap's PMSI secures the entire debt that Kitsap claims. The Court concludes the PMSI does not secure the portion of the claim attributable to the Option Contracts, and the Court may therefore bifurcate the claim.

### 1. The Option Contracts Were Not Part of the Purchase "Price" of the Vehicle.

The Court must begin with the Ninth Circuit's seminal decision in *Penrod*. In that case, the debtor purchased a vehicle 523 days prior to filing for chapter 13 bankruptcy. The creditor, who had financed the automobile purchase, objected to the debtor's chapter 13 plan that proposed to bifurcate its claim into secured and unsecured portions, asserting that it held a PMSI in the "negative equity" attributable to the debtor's trade-in financed in connection with the purchase.[8] The Ninth Circuit ruled the creditor did not possess a security interest in the sums advanced to pay the negative equity. *Penrod II*, 611 F.3d at 1164.[9]

Kitsap argues any reliance on *Penrod* is misplaced, as the decision was limited to negative equity in a trade-in vehicle and did not include optional gap insurance or maintenance contracts. The Court disagrees. The *Penrod* court explicitly stated the "key issue of [the] appeal" was "the meaning of 'price' for the purposes of the purchase money security interest." *Id.*

---

[8] The term "negative equity" is commonly used in the automobile lending industry to describe the difference between a trade-in vehicle's outstanding loan balance and its market value. For example, in *Penrod*, the debtor purchased a new car for $25,600. The debtor traded in her old car and paid $1,000 down for her new vehicle. She owed over $13,000 on the old car, and she received $6,000 in trade-in credit. Thus, there was over $7,000 in "negative equity" on the trade-in vehicle. The dealership paid off the remaining balance on the old car and added the negative equity to the amount financed. Accordingly, the debtor financed $31,700 in order to purchase a vehicle that cost $25,600. *Penrod II*, 611 F.3d at 1159–60 (all amounts are approximates).

[9] *Penrod* was based on California law. Washington's version of U.C.C. § 9–103 is identical to California's. *Compare* RCW § 62A.9A–103 *with* Cal. Comm. Code § 9103. The Ninth Circuit's holding in *Penrod* is thus binding on retail installment contracts entered into in Washington. *See In re Siemers*, 2011 WL 5598349, *3 fn.1 (Bankr. W.D. Wash. 2011).

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 5

Likewise, the key issue before this Court is whether optional gap insurance and maintenance contracts are part of the "price" of the vehicle. The Ninth Circuit, citing UCC Official Comment 3, defined the meaning of "price" for purposes of a PMSI: "[T]he 'price' of collateral or 'value given to enable' includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations." *Id.* at 1161–62. Comment 3 further provides that for a PMSI to arise, there must be a "close nexus between the acquisition of the collateral and the secured obligation." UCC § 9–103 cmt. 3.

*Penrod* then determined if adding the payment of negative equity to the contract fit within that definition. The Ninth Circuit concluded it did not, as it was "not an expense incurred in buying the new vehicle," and the negative equity was not sufficiently connected to the purchase of the vehicle to establish a PMSI. *Penrod II*, 611 F.3d at 1162. The Ninth Circuit also rejected the creditor's argument that negative equity was "closely related" to the sale, noting that "[w]hile the trade-in and new purchase may be performed at the same time, or use one unified document, this does not automatically mean that there is a purchase money security interest." *Id.* Moreover, "negative equity cannot fall under the 'other similar obligations' category because negative equity is unlike the examples listed in Comment 3," which are transaction costs related to the purchase. *Id.*

*Penrod* also rejected the *in pari materia* doctrine as a way to determine the meaning of "price" of the collateral.[10] *Penrod* involved the California Automobile Sales Finance Act ("ASFA"), which includes negative equity in its definition of "cash price" of a vehicle. *Id.* at 1163. Invoking the *in pari materia* doctrine, the creditor argued the ASFA definition of "cash price" should apply within the UCC. The Ninth Circuit disagreed, finding that the ASFA definition "says nothing about whether those charges result in a purchase money security

---

[10] "*In pari materia*" is Latin for "in the same manner" and is defined in Black's Law Dictionary to mean "on the same subject" or "relating to the same manner." BLACK'S LAW DICTIONARY (10th ed. 2014). "It is a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." *Id.*

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 6

interest." *Id.* (citing *Ford v. Ford Motor Credit Corp.* (*In re Ford*), 574 F.3d 1279, 1292–93 (10th Cir. 2009) (Tymkovitch, J., dissenting)).

Although the parties did not address the *in pari materia* issue, the Court concludes the doctrine must be rejected in this case as well. Washington's definition of "sale price" as defined in the Retail Installment Sales of Goods and Services section of the RCW is as follows:

> "Sale Price" means the price for which the seller would have sold or furnished to the buyer, and the buyer would have bought or obtained from the seller, the goods or services which are the subject matter of the retail installment transaction. The sale price may include any taxes, registration and vehicle license fees, the cost of a guaranteed asset protection waiver, any vehicle dealer administrative fee, any vehicle dealer documentary service fee, any charges for transferring vehicle titles, delivery, installation, servicing, repairs, alterations, or improvements.

RCW § 63.14.010(14). Notably, the definition includes "guaranteed asset protection waiver" (i.e., gap insurance) along with "servicing" and "repairs" (i.e., maintenance contracts). However, under *Penrod*, the Court should not consider the Washington definition of "sale price" any further than its intended application in the "Personal Property" title of the RCW, which specifically states that definitions in that section apply only "*[i]n this chapter*, unless the context otherwise requires."[11] RCW § 63.14.010 (emphasis added). To the contrary, Official Comment 3 to RCW § 62A.9A–103 provides its own definition of "price," discussed above. If the Washington legislature intended the definition of "price" to encompass gap waivers, servicing, or repairs, it would have included a definition in Washington's Uniform Commercial Code.[12] The Court concludes the *in pari materia* doctrine is inapplicable in this context.

Accordingly, this Court finds the Option Contracts are not part of the "price" of the Vehicle secured by the PMSI. Like negative equity, the Option Contracts are not sufficiently related to the purchase of the Vehicle. Unlike other expenses listed in Official Comment 3, neither the purchase of *optional* gap insurance or maintenance contracts are akin to sales tax and

---

[11] The Court is aware of the unpublished decision of *In re Wear*, 2008 WL 217172 (Bankr. W.D. Wash. Jan. 23, 2008), which looked to Washington's definition of "sale price" contained in RCW 63.14.010 to support its conclusion that negative equity was not part of the sale price. *Wear* was decided prior to *Penrod*, and the Ninth Circuit ruling now guides this Court on the application of the *in pari materia* doctrine when construing the definition of "price."

[12] *See* RCW § 62A.1–201 (general definitions). *See also* Wash. F. B. Rep., S.B. 6186, 56th Leg., 2nd Reg. Sess. (Wash. 2000) (repealing and replacing Washington's prior version of UCC Article 9 with the revised UCC Article 9 "with some changes to better conform it to other areas of Washington law.").

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 7

license fees, which are not optional but are required in order to obtain the vehicle. Simply including the Option Contracts in the Sale Contract does not create a sufficient nexus between the acquisition of the collateral and the secured obligation to transform the Option Contracts into part of the price of the Vehicle. Rather, these are multiple financial transactions memorialized on a single retail installment sale document.

### 2. The Option Contracts Were Not Part of the "Value Given to Enable the Debtor to Acquire Rights In" the Vehicle.

Kitsap argues, in the alternative, that the Option Contracts were part of the value provided to enable the Debtor to purchase the Vehicle, and therefore the claim is still entitled to protection under the hanging paragraph. As discussed by the Ninth Circuit in *Penrod*, "price" and "value given to enable" are two distinct concepts:

> Both sellers and third party lenders can obtain purchase money security interests. A seller obtains a purchase money security interest through a dealer financed sale, where the merchandise goes out the door upon the credit of the buyer. Payment is to be made to the dealer. A purchase money security interest is only valid for the "price" of the merchandise. A lender such as a finance company, bank, or credit union obtains a purchase money security interest when it makes funds available to the purchaser to buy the merchandise. The money is provided to the borrower to make the purchase. That language is somewhat broader than "price" because the money has to be traced from the lender to the borrower to the seller. Broad language is employed to encompass third party financing, not to expand the scope of purchase money security interests.

*Penrod II*, 611 F.3d at 1164 (internal citations omitted).

Here, Kitsap asserts it holds a PMSI in the entire amount financed because the Option Contracts were part of the "value given to enable" the purchase. It appears from the record, however, the sale was executed by the dealer, West Hills Ford Mazda, and the indebtness was assigned to Kitsap.[13] If the dealer facilitated the transaction, then "price" should be used instead of "value given to enable," as the sale was not enabled by the secured lender but rather the seller/dealer. *See Penrod II*, 611 F.3d at 1164 fn.3.

Even if Kitsap was in fact an active participant and financed the transaction, the Court

---

[13] The Retail Installment Sale Contract included with the proof of claim lists West Hills Ford Mazda as the "Seller-Creditor." Kitsap Credit Union is listed as the "Assignee."

concludes the "value given to enable" the sale did not include the Option Contracts. Kitsap relies on a South Carolina bankruptcy court decision which held that gap insurance, a service contract, and other items had a sufficient nexus with the price of the vehicle to maintain the PMSI because they added value for the debtor to the consideration received and had no value whatsoever unless incorporated into the purchase of the vehicle. *In re Macon*, 376 B.R. 778, 782–83 (Bankr. D.S.C. 2007). However, *Macon* is not binding on this Court, and its reasoning runs contrary to *Penrod*. While other circuit courts have held that a creditor retains a PMSI in negative equity, the Ninth Circuit explicitly declined to adopt the reasoning of its sister circuits.[14]

Moreover, Kitsap incorrectly equates the term "value given to enable" with the concept of "added value to." While it may be true the Option Contracts added value to the collateral for the Debtor, the contracts were entirely optional; thus, purchase of these items did not enable the sale.[15] With regard to the gap insurance, the Sale Contract specifically notes, "A gap contract . . . . is not required to obtain credit . . . ." Claim No. 1, Attachment, at 2. Unlike sales taxes and other similar obligations, these Option Contracts were not required as part of the price to obtain the collateral. Neither gap insurance nor maintenance contracts are inextricably intertwined with the "value given to enable." Nothing in the record suggests the Option Contracts enabled the Debtor to acquire rights in, or the use of, the Vehicle. Instead, those obligations are attached to components of the sale price but are wholly unrelated to the acquisition of the collateral. The Court concludes Kitsap's claim is not protected in its entirety by the hanging paragraph and thus is subject to bifurcation.

**C.    The Prepetition Payments Shall Be Allocated in Accordance with the "Dual Status Rule" to Determine the Extent of Kitsap's Secured Claim.**

Because the Option Contracts are not protected as part of the PMSI securing the Vehicle, the Court must next determine how to apply the Debtor's prepetition payments to Kitsap. Kitsap

---

[14] *See Penrod II*, 611 F.3d at 1160–61 ("We decline to adopt the reasoning of our sister circuits. We acknowledge that our decision creates a circuit split, and we do not do this lightly. However, we are persuaded by the well-reasoned decision of Bankruptcy Judge Markell and his colleagues on the BAP.").

[15] *See, e.g.*, *Penrod I*, 392 B.R. at 852 ("[T]o take a fanciful example, if a car lender offered to pay off a car buyer's second mortgage as a promotional campaign for new car sales, and then rolled the amount of the mortgage into the amount financed, the payment of the mortgage would be value under [UCC] § 1-204, but it could not fairly be said to be a part of the purchase-money debt.").

carries the burden to establish the extent to which its security interest is a PMSI. *See* RCW § 62A.9A–103(g).

Kitsap cites RCW § 62A.9A–103 "comment b" for the proposition that the Debtor's prepetition payments must be applied to pay the amounts incurred for the Option Contracts first, and then applied to the Vehicle debt. Kitsap appears to be referring to Official Comment 7, part b, which permits the obligor to determine how payments should be allocated; if the obligor fails to manifest its intention, obligations that are not secured will be paid first.

Kitsap misinterprets the meaning of "secured." Official Comment 7 applies to "non-consumer-goods transactions." Under Washington's version of the UCC, the Sale Contract is considered a non-consumer-goods transaction since the aggregate value exceeds $40,000. *See* RCW § 62A.9A–102(24) and (25).[16] There is no evidence the parties agreed to apportion the prepetition payments between the Option Contracts and the other amounts financed. In the absence of an agreement, Kitsap is correct that payments are applied first to any unsecured obligation. RCW § 62A.9A–103(e)(3). However, the Official Comment clarifies the meaning of "secured": "As used in this Article, the concept of 'obligations that are not secured' means obligations for which the debtor has not created a security interest. This concept is different from and should not be confused with the concept of an 'unsecured claim' as it appears in Bankruptcy Code Section 506(a)." *Id.*, cmt. 7.b. [17] Thus, the statute's meaning of "obligations that are not secured" is intended to refer to obligations not secured by a PMSI in the traditional context outside of bankruptcy—not in the cramdown context as Kitsap asserts.

The evidence shows the Sale Contract included the amounts for the Option Contracts, and there was no agreement to pay for the Option Contracts first. *See In re Siemers*, 2011 WL

---

[16] RCW § 62A.9A–102(24) defines "consumer-goods transaction" as a consumer transaction in which an individual incurs a consumer obligation and a security interest secures the obligation. RCW § 62A.9A–102(25) defines "consumer obligation" as an obligation which "[i]s incurred as part of a transaction entered into primarily for personal, family, or household purposes; and [a]rises from an extension of credit, or commitment to extend credit, in an aggregate amount not exceeding forty thousand dollars, or is secured by personal property used or expected to be used as a principal dwelling."

[17] While the Official Comments to the UCC do not have the force of law, the majority of courts give "considerable weight to the comments." *Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC*, 369 F.3d 603, 614 (1st Cir. 2004) (citing E.A. Farnsworth, 1 FARNSWORTH ON CONTRACTS § 1.9a (3d ed. 2004). Courts in Washington have relied on the Official Comments to the UCC. *Travelers Cas. & Sur. Co. v. Wash. Tr. Bank*, 383 P.3d 512, 518 (Wash. 2016) (en banc) (quoting *Bank of Am. NT & SA v. David W. Hubert, PC*, 101 P.3d 409, 414 n.9 (Wash. 2004) (en banc)).

5598349, *3 (Bankr. W.D. Wash. 2011) (the contract governs the application of prepetition payments). The entire obligation was secured under Washington law, so there was no unsecured portion to which any payments could be applied first. Accordingly, the Court concludes Kitsap applied each payment to reduce the overall loan balance, with no priority afforded to the Option Contracts.

The Court must then determine the viability and extent of the PMSI. The "dual status rule" allows part of a loan to have purchase money status, while the remainder is secured by a regular security interest. Conversely, the "transformation rule" provides that "when a transaction contains both purchase money and non-purchase money obligations, the entire transaction is transformed into a non-purchase money obligation," thereby not affording any protection against cramdown of the secured creditor's claim. *Penrod I*, 392 B.R. at 857 (internal quotes and citations omitted). For non-consumer-goods transactions, the UCC and Washington law reject the transformation rule and adopt the dual status rule. *See* RCW § 62A.9A–103(f)(1) ("In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if [t]he purchase money collateral also secures an obligation that is not a purchase-money obligation."); *id.*, cmt. 7.a. ("For transactions other than consumer-goods transactions, this Article approves what some cases have called the 'dual status' rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent. . . . [T]his Article rejects the 'transformation' rule adopted by some cases, under which any cross-collateralization, refinancing, or the like destroys the purchase-money entirely.").[18]

*In re Brodowski*, 391 B.R. 393 (Bankr. S.D. Tex. 2008), is particularly instructive with respect to how prepetition payments should be allocated under the dual status rule. In that case, to determine the pro rata allocation of prepetition payments, the bankruptcy court subtracted the amount found to be unsecured under section 506 from the amount financed under the original

---

[18] Regarding consumer-goods transactions, the Bankruptcy Appellate Panel and other courts in the Ninth Circuit have followed the dual status rule, though it has not been adopted by the Court of Appeals. *See Penrod II*, 611 F.3d at 1160 n.2, *aff'g Penrod I*, 392 B.R. 835 ("We note that the Parties have not challenged the BAP's decision regarding the application of the dual status rule. Therefore, we will not address whether the dual status rule or the transformation rule should apply . . . .").

MEMORANDUM DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 1 OF KITSAP CREDIT UNION - 11

contract. That total constituted the secured PMSI. The Court determined the percentage of this balance compared to the total amount financed, and then used that percentage to allocate prepetition payments between the secured and unsecured portions. *Brodowski*, 391 B.R. at 403.

The Court concludes it is appropriate to allocate the prepetition payments in the same manner as in *Brodowski*. Applying that method here, the total amount financed on the Sale Contract was $61,061.76. Of this amount, $3,946.00 represents the Option Contracts, which this Court concludes are not secured by the PMSI. The balance of $57,115.76 constitutes a purchase money obligation, which represents 93.54% of the total amount financed ($57,115.76 ÷ $61,061.76), while the Option Contracts represent 6.46% of the total amount financed. Per the proof of claim, the Debtor owed Kitsap $58,230.19 as of the petition date. Therefore, $54,468.52 of Kitsap's claim is secured by the PMSI ($58,230.19 x .9354). The remaining balance of $3,761.67 may be treated as unsecured because the value of the Vehicle is less than the claim ($58,230.19 – $54,468.52). Stated another way, $2,648.65 of the prepetition payments was allocated to the amount secured by the PMSI ($61,061.76 – $58,230.19 = $2,831.57 x .9354), and $182.92 was allocated to unsecured balance of the loan ($2,831.57 x .0646).

## IV.    CONCLUSION AND ORDER

The Court concludes that Kitsap Credit Union's purchase money security interest in the Vehicle does not secure sums advanced to pay for optional gap insurance and vehicle maintenance contracts. Further, payments made on the debt prepetition shall be allocated pro rata between the secured and unsecured amounts of the loan in accordance with the "dual status rule." For these reasons, it is hereby

ORDERED that the Objection to Claim No. 1 of Kitsap Credit Union shall be and is hereby SUSTAINED; and it is further

ORDERED that Claim No. 1 of Kitsap Credit Union shall be allowed as a secured claim in the amount of $54,468.52, and as a general unsecured claim in the amount of $3,761.67.

/// END OF MEMORANDUM DECISION ///